Filed 5/20/20 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re D.B., a Person Coming Under the Juvenile Court Law. | B298750 |
| _____ | (Los Angeles County |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Super. Ct. No. 18CCJP07975) |
| Plaintiff and Respondent, | **ORDER MODIFYING OPINION** |
| v. | **[No change in judgment]** |
| B.K., | |
| Defendant and Appellant. | |

THE COURT:

IT IS ORDERED the opinion in the above-entitled matter filed on April 30, 2020 be modified as follows:

1. On page 14, second sentence of the fourth paragraph, delete the word "laudably."

2. On page 16, delete both paragraphs under Section B.1. Replace with the following paragraph under Section B.1:

"Father's first argument is the juvenile court impermissibly restricted the family court's power to modify custody or visitation.  But the juvenile court did not restrict the family court's power.  Father can go to family court as he pleases and seek modification on whatever basis he wants.  What the juvenile court said about counseling does not limit the family court's power at all.  The juvenile court order does not tell the family court what to do.  It tells Father and Mother what to do.  Father's first argument is in error."

There is no change in the judgment.

_____

BIGELOW, P.J.               GRIMES, J               WILEY, J.

Filed 4/30/20 (unmodified version)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re D.B., a Person Coming Under the Juvenile Court Law.<br><br>_____<br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>B.K.,<br><br>    Defendant and Appellant. | B298750<br><br>(Los Angeles County Super. Ct. No. 18CCJP07975) |

        APPEAL from orders of the Superior Court of Los Angeles County, Harry A. Staley, Judge.  Affirmed.

        Law Office of Melissa A. Chaitin and Melissa A. Chaitin, under appointment by the Court of Appeal, for Defendant and Appellant.

        Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

                        _____

The juvenile court found jurisdiction over Daughter and terminated the case with a juvenile custody order. Father appeals. We affirm. All statutory citations are to the Welfare and Institutions Code.

## I

We recount facts about Daughter, Mother, and Father.

## A

Daughter's parents met in 2003 and dated for about a year. The relationship ended because Father did not want a commitment. Mother married another man but it did not work out and the spouses separated. While still legally married to the other man, Mother began seeing Father again and became pregnant by him. Mother wanted to avoid conflict during pregnancy and so did not tell Father about it.

Mother gave birth in the summer of 2006. Mother revealed the fact to Father about a month later. Father responded by accusing Mother of ruining his life: "'How dare you have a kid?'" The couple began proceedings in family court, where Father declared Mother "masterplanned to get pregnant from me and she refused to get [an] abortion."

Mother and Father never married.

The family court granted Mother sole physical custody of Daughter. The parents shared joint legal custody. Father's visits with Daughter were Monday and Wednesday evenings from 5:00 p.m. until 7:00 p.m. and alternating Saturdays, from 9:00 a.m. until noon.

## B

The Department of Children and Family Services became involved and now is the respondent in this case.

On November 19, 2017, the Department received an allegation Father was emotionally abusing Daughter. Father refused to meet with the Department, which closed the referral as inconclusive.

Less than a year passed before the Department heard more about Father and Daughter. The child protection hotline got a call on October 23, 2018, about the previous evening. Daughter was 12 years old. Father went to Daughter's home for a visit but arrived late, at about 7:15 p.m. The scheduled time had been 5:00 p.m. to 7:00 p.m. Daughter no longer wanted to go with Father because she had to finish homework. Father left briefly but returned and began throwing objects like rocks or metal at the front door and windows. The sounds were like gunshots.

Father's violence frightened Daughter. She was "'very stressed out and scared.'" Later there was testimony that, during this event, Daughter hid in a closet, crying, and did not want to come out. Police came but arrested no one.

C

Based on the hotline call, the Department opened an investigation and gathered information.

Father wrote in court papers he had been in custody for 11 1/2 months because "I have been wrongly accused of a misdemeanor . . . ."

The Department obtained police call out records for Father's home, which is different than Mother's and Daughter's. The records for Father's address showed 22 call outs over six years. The episodes were diverse. The most recent was by "father, physical assault by neighbor. Both parties taken to West Valley Police Station." The next is by "Kathy, [reporting party] has a restraining order against the father." Others involve "dispute with tenant," "Kathleen, father in back yard despite a Restraining Order in

3

place," "ongoing neighbor dispute," "father [reports] [n]eighbors possibly throwing rocks at residence," "suspect threatening him with a taser and dog," "[m]utual battery reports filed," "suspect throwing rocks," "PD needed to keep the peace," "[o]ne female is threatening PR with a taser," "[u]nknown suspect throwing rocks and gravel at PR's residence," and "[p]ossible transient in front of location yelling and talking to himself."

Mother's roommate and landlord won a restraining order against Father. Father told Daughter this woman is a "'fucking bitch.'"

Father repeatedly came to the house other times outside of the visitation schedule. This caused conflict.

Mother had called police "multiple times" about Father in the past.

Over the previous three years, Daughter had become more vocal about not wanting to visit with Father. Father made disparaging remarks about Mother and her culture.

Father called Mother a "'stupid whore and bitch'" in front of Daughter.

Father texted Mother that Daughter would become a drug addict by the time she was 18 years old, followed by the text "very sad Spanish sty [*sic*] life."

Mother's family hails from Central America. Father's heritage is from a culture in which the native tongue is not Spanish.

Father repeatedly came to the home and was "verbally aggressive, including racial remarks." Daughter said Father talks "'badly about my mom's family.'"

Daughter said that, even when Father tried to instigate arguments with Mother, Mother would do her best to avoid arguments with Father. Mother gave Daughter encouraging advice and validated her concerns but still encouraged her to visit with

4

Father and to maintain a relationship with him.  Mother told Daughter she must always respect Father.

Many times Father made comments that made Daughter upset.  He called her a liar.  Father told Daughter she would never amount to anything.  He said she was fat and would grow up to be a loser like her mother.  He made frequent comments about Daughter's weight.  Father forced Daughter to ride a stationary bike for an hour.

Daughter said "'he's never been a good dad.'"  She felt depressed and overwhelmed by Father's actions and had nightmares.  Father was "usually difficult and irrational."  His anger was "'over the top irrational.'"  Daughter was "'scared about what he will say or do.'"  She was very fearful of Father and very distraught after visits with him.  Many times she returned from these visits "very nervous to the point that her hands were shaking."

According to Daughter, nothing would make the relationship better because Father "'won't cooperate with anything.'"  He made her feel "'trapped.'"  "'[T]here is no way I would ever live with him.'"  She said Father "'is a vicious man, and says if I stay with my mother, I will be a drug addict like my mom.'"  The Department, however, received no information Mother had any involvement with drugs.

When Father came to Daughter's home in an aggressive manner, it made her "'hysterical.'"  Daughter wrote to the court that Father "'does nothing but make me stressed out, insecure, miserable, and sad.'"

D

On December 14, 2018, the Department filed a section 300 petition on behalf of Daughter, alleging Father's conduct placed the

child at substantial risk of serious emotional damage pursuant to subdivision (c).

The juvenile court held a detention hearing on December 17, 2018. Judge Stone appointed counsel for Father. Counsel, including Father's attorney, presented their clients' positions to the court.

Then Father broke in: "I need to be heard, Your Honor." The court told Father he had to speak with his attorney. Father replied: "Well, if [my attorney] stops me, then I'm going to relieve him. Then I speak and represent myself." The court ordered Father to talk to his attorney and to tell the attorney what Father wanted said to the court.

Father interrupted and said, "This is what I said."

At this point, the court said, "Sir, Sir, you are not in charge of how this court is run." The court patiently explained courtroom procedure to Father. Father and his attorney conversed.

Father's attorney then spoke, relaying Father's concern. While the court was responding, Father interrupted again: "I need to be heard, Your Honor."

The court again ordered Father to stop talking. Father again interrupted the court.

The court said, "I'm going to have to ask you to leave if you can't remain quietly there at the table so—"

Father again interrupted: "This is about the child. We are here for the child. This is in the interest of the child or not?"

The court responded it was aware "we're here for the child."

Father kept speaking. The court told Father "[y]ou don't set the rules here." Father said, "This is not the rules."

The court said, "I'm stopping you right now. And if not, you will be leaving. Okay? That's it." Father said okay.

The court then found a prima facie case for detaining Daughter from Father under section 300, subdivision (c). The court ordered no visits for Father pending the next hearing and ordered the Department to prepare a further report. The court set a date for the next hearing.

On January 4, 2019, Judge Stone held a *Marsden* hearing.

On February 20, 2019, Judge Spear held a further hearing, but a witness was sick. The court continued the matter to April 3, 2019.

On April 3, 2019, Referee Grodin held a further hearing, which was continued because an attorney was on jury duty.

On May 22, 2019, Judge Staley heard the matter for trial. Father asked for another *Marsden* hearing saying, "I had the previous attorney, he did a bad job, the court let him go. They assigned this gentleman." The court held another *Marsden* hearing and denied Father's motion. Then Father moved to represent himself. At the conclusion of the *Faretta* hearing, Father withdrew his motion.

At trial, Father called Daughter to testify as a witness. Daughter testified she was 12 years old. When asked whether there were periods when she cried as a result of having to see her father, Daughter answered, "Oh, many, yeah." She had not seen Father for five or six months and that made her feel "[g]ood. I mean, I'm not feeling nearly as anxious or stressed out as I had been when he was—when I was going and he was saying all those bad things." As a result of seeing Father, Daughter had had trouble sleeping and had felt insecure, "[k]ind of hopeless," and "like it was never going to get better or anything."

Father testified. He denied throwing things at Daughter's home. Father said he had encouraged Daughter to engage in sports. Father testified Daughter was lying when she said he has

7

called her "overweight, fat, or chubby." He confirmed he had called Daughter a liar, and he had told Daughter Mother is a liar too.

Father testified, "I texted the mother that the way your group is doing, the way you are doing this to the child, the child may become [a] drug addict." Father testified "I never said anything negative about [Daughter's] ethnicity."

The court ruled the evidence supported the allegations in the Department's petition about the risk of severe emotional injury to Daughter. The court then terminated jurisdiction and awarded full legal and physical custody to Mother. The court permitted Father monitored visits with Daughter upon completion of individual counseling and also five counseling sessions to be held jointly with Daughter. Father appealed.

## II

The juvenile court correctly ruled evidence supported the Department's section 300 petition. We affirm findings under section 300 when, as here, substantial evidence supports them. (*In re James C.* (2002) 104 Cal.App.4th 470, 482.)

## A

A child comes within the jurisdiction of the juvenile court under subdivision (c) of section 300 if (with our italics) the child is at "*substantial risk* of suffering serious emotional damage, evidenced by *severe anxiety*, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent . . . ."

## B

The confluence of five factors supports the court's finding of a *risk* of serious emotional damage to Daughter. The five factors are violence, systematic verbal abuse, racism, impulsivity, and lack of insight. This combination created substantial evidence Daughter suffered "severe anxiety," which in turn was evidence of a

"substantial risk" Daughter would suffer serious emotional damage. We note each element in this set of five.

1

Father was violent. His violence scared Daughter and made her anxious. Father's violence made Daughter cower and cry in a closet while he assaulted her home. Daughter's fear of Father's violence made her unwilling to come out of the closet where she hid.

Father denied he ever was violent, and suggests, even if he were, it was only once. The juvenile court, however, was entitled to reject Father's denial of violence as self-serving and unbelievable.

A 12-year-old can extrapolate from one vivid experience. Daughter did. She considered Father a vicious man. An arresting demonstration of a parent's violent potential can reframe a child's understanding of her parent's character and can increase her fright and the risk of emotional damage to her. That was true here.

2

Father verbally abused Daughter in routine and wide-ranging ways. He demeaned her character, her body, her prospects, her mother, and her ethnic heritage. Father's persistent emotional abuse made Daughter fear every interaction with him. Joined with other factors, severe and persistent verbal abuse can create a substantial risk of serious emotional damage.

3

Racist harassment can be poisonous. This is particularly so within what once was a family. It is one thing for a child to dismiss racism in strangers as ignorant talk from people the child may not respect and can avoid. It is another for the child to fend off racism from those she is supposed to love and respect as role models and teachers. When the authority figure aims the racism at the child's mother and her family and by extension to the child as well, the risk of emotional damage increases.

9

Father's impulsive court conduct tended to verify the Department's case. In the formal setting of a courtroom, with counsel to advise him and to help moderate his conduct, and with the court reporter capturing each word, Father nonetheless could not easily restrain himself.

Across a range of conflicts, Father was the common denominator. His anger made him "over the top irrational."

Angry impulsivity tends to magnify issues of violence, verbal abuse, and racism. This increased the risk of emotional damage to Daughter.

Father lacked insight. The problem was always others, never him. Father could not acknowledge he might be a source of difficulty.

Realizing conduct needs improvement is a first step to improvement. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) Father gave no sign he would change his conduct or alter the risks his conduct was creating for Daughter.

### C

Taken together, these five elements validate the court's decision. And when the juvenile court proceedings began and sealed Father off from Daughter for months, Daughter flourished. She began to feel good. The juvenile court was entitled to conclude Father's conduct did create a substantial risk of serious emotional damage.

### D

The long and ongoing family law proceeding between Father and Mother does not change the analysis under section 300 here. True, the juvenile court must never, for illegitimate tactical

reasons, become a new front in a family law war.  (E.g., *In re Nicholas E.* (2015) 236 Cal.App.4th 458, 466.)  But nothing suggests Mother engineered a bad faith flanking maneuver into juvenile court to shop for judges.

E

Father cites inapposite cases.

The decision in *Nahid H. v. Superior Court* (1997) 53 Cal.App.4th 1051, 1070 (*Nahid*) made a sage observation.  "Parents may entertain beliefs and engage in activities with which their children disagree, including political beliefs and activities.  One need only recall the student protests over the Vietnam War in the 1960's to recognize that serious political differences can arise between the generations within a family.  But no one would seriously propose that political differences between parent and child—even major ones—would support the dependency jurisdiction of a juvenile court, absent a substantial risk of palpable harm to the child."

*Nahid* was right but does not apply.  It was not some political difference that divided Father and Daughter.

Nor does the opinion in *In re A.G.* (2013) 220 Cal.App.4th 675, 683–686 (*A.G.*) govern.  There the Department asserted jurisdiction on a different basis than it did in this case.  The mother in *A.G.* suffered from a grave mental illness and stayed in her room.  (*Id.* at p. 684.)  The Department claimed jurisdiction on the ground she could not care for the children.  (*Id.* at p. 682.)  The *A.G.* decision rejected this claim because the father had been effective in providing all needed care.  (*Id.* at p. 684.)  "Although the evidence supported the finding that Mother was unable to provide regular care for the minors due to her mental illness, Father has shown remarkable dedication to the minors and that he is able to protect them from any harm from Mother's mental illness."  (*Ibid.*)  By

11

contrast, in this case no one claims Mother is unable to provide Daughter with needed care. Rather the Department proved Father created a risk of emotional injury to Daughter through his visits with her—visits the family court ordered and that Mother was powerless to block. *A.G.* has no application here.

The same analysis applies to Father's citation of *In re Phoenix B.* (1990) 218 Cal.App.3d 787, 792. ("The Department detained Phoenix because of her mother's psychiatric commitment. It then investigated Phoenix's immediate circumstances and discovered that her father was willing and able to provide for her care.")

Also inapposite is *In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1263, where the court determined the father was an admirable parent in every respect.

Father cites *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379–82 (*Brison C.*). Regarding this case, we quote *In re A.J.* (2011) 197 Cal.App.4th 1095, 1105–1106: "We question the soundness of the *Brison C.* court's conclusion the minor displayed no signs of serious emotional damage. The minor in *Brison C.* feared his father, had suicidal ideation if forced to visit or live with him, and suffered nightmares. (*Brison C.*, *supra*, 81 Cal.App.4th at p. 1377.) The conflict between his parents caused him "'upset, confusion and gastrointestinal distress.'"

We share these questions.

Apart from these questions, *Brison C.* also differed from this case. The father there realized "'that he could have handled things differently, that he could have chosen different words when he spoke with Brison.'" (*Brison C.*, *supra*, 81 Cal.App.4th at p. 1377; see also *id.* at p. 1381 [both parents recognized their past behavior was inappropriate].) In contrast to Father, the parents in *Brison C.* had some insight.

In sum, the evidence supported the court's assertion of jurisdiction.

## II

Father incorrectly argues the juvenile court erred by terminating jurisdiction over Daughter at disposition. Citing *In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1491, Father contends that, "[g]iven the strained and damaged relationship between mother and father, it was premature for the court to terminate jurisdiction at the disposition hearing."

The question is whether juvenile court services and ongoing supervision were necessary to protect the child from harm. (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 205–213.) If Daughter was safe, then services and supervision were unnecessary and the juvenile court could close the case. Statutes grant the juvenile court broad authority to enter orders to protect a dependent child and to reunite the family and terminate jurisdiction as quickly as possible. (*Id.* at p. 207.) That authority includes discretion to terminate dependency jurisdiction when the child is in parental custody and no protective issue remains. (*Ibid.*)

Father agrees the standard of review is deferential. (See *In re Ethan J.* (2015) 236 Cal.App.4th 654, 660 (*Ethan*).)

There was no termination error. Substantial evidence showed Daughter was safe. The court did not abuse its discretion.

Daughter's safety arose from the orders and timing in this case. The court's initial and provisional order on December 17, 2018, was no visits for Father. The court continued the matter for months. The reasons were various and happenstance: someone was sick, another time someone was on jury duty, and so on. By the time the evidentiary hearing finally went forward on May 22, 2019, Daughter had gone for months without contact from Father. She

13

had been free of Father's emotional abuse.  This freedom improved her life and restored her emotional health.

No evidence suggested Mother or Father would stop complying with the court's orders if the court closed the case.  Rather, all the evidence was Daughter would be safe without the court watching her.  There was no need for jurisdiction over Daughter to continue after May 22, 2019.  Father had been the problem, and Father had been gone.

Father's reply brief in this court did not respond to the Department's analysis of this issue.

The juvenile court did not err by terminating jurisdiction.

### III

Father's final argument is the juvenile court's order unreasonably restricted the family court's power to modify custody or visitation.  Father laudably acknowledges the juvenile court is vested with broad discretion to make orders when it terminates jurisdiction.  The juvenile court's primary focus is the best interests of the minor.

First we describe the challenged order.  Then we examine and reject Father's attacks upon it.

### A

The court consulted with the parties about the proper juvenile custody order.  The issue was whether Father could visit Daughter and, if so, on what terms.

Daughter's counsel asked the court to order "either no visits or monitored visits in accordance with the child's wishes, Your Honor."  Mother's counsel said she "would agree with that provision regarding visitation."

The court began to issue such an order:  "The court will terminate jurisdiction and provide full legal and physical custody to

14

Mother.  Monitored visits for the father at the discretion of the child—"

The Department interrupted the court:  "Your Honor, I'm going to have to object to that order."  The Department's objection was it "is reversible error.  There is case law that the court can't do it."

The court immediately agreed with the Department's objection:  "As I was saying that, I was thinking I can't leave that up to the child."  Father's attorney chimed in:  "Thank you, Your Honor."

The Department recommended no visits until Father "has been in individual counseling and there has been conjoint counseling sessions as well.  And those sessions would be equivalent, in some sense, to a monitored visitation order.  But at this point, given the testimony of the father and his lack of insight and compliance—"

The court broke in.  "Let me interrupt.  The court is inclined to modify its order to make those monitored visits for the father upon completion of individual counseling and a minimum of five conjoint therapy sessions with the child."

Mother's counsel asked for clarification.  "[I]t's individual counseling for the father and then five conjoint therapy sessions with the minor?"  The court responded "[a] minimum of five, yes."

Father objected.

The court responded to Father.  "The father has made no attempts to be involved in any rehabilitation efforts up to this point, has treated the child—although the child is doing better now—and that's clear from the testimony . . . .  But that wasn't the situation when the father was having contact with the child and making negative comments about the mother to the child and negative comments to the child about the child and about her prospects in

15

life, becoming an addict a possibility.  And that request [by Father for immediate unmonitored contact with Daughter] is denied."

The juvenile court's minute order was that "Father is to have monitored visits upon completion of individual counseling and 5 conjoint therapy sessions with the minor."  Its further written order was Father "may have monitored visitation upon completion of or a showing of substantial compliance in individual counseling and five conjoint counseling sessions with the child."

B

Father makes three unavailing attacks on this order.

1

Father's first argument is the juvenile court impermissibly restricted the family court's power to modify custody or visitation.  This invalid argument ignores what the custody order says.

 The juvenile court did not restrict the family court's power.  Father can go to family court as he pleases and seek modification on whatever basis he wants.  What the juvenile court said about counseling does not limit the family court's power at all.  The juvenile court order does not tell the family court what to do.  It tells Father and Mother what to do.  Father's first argument is in error.

2

Second, Father claims the order invalidly conditions Father's visits and modifications to the order upon the completion of counseling, citing *In re Cole Y*. (2015) 233 Cal.App.4th 1444, 1456 (*Cole*).  The court's order, Father contends, violates subdivision (d) of section 302.

Subdivision (d) of section 302 provides "[a]ny custody or visitation order issued by the juvenile court at the time the juvenile court terminates its jurisdiction . . . shall be a final judgment and shall remain in effect after that jurisdiction is terminated.  The

16

order shall not be modified in a proceeding or action described in Section 3021 of the Family Code unless the court finds that there has been a significant change of circumstances since the juvenile court issued the order and modification of the order is in the best interests of the child."

We do not understand how this provision, which empowers the juvenile court, can operate to *constrict* its power. For this reason, at the least, we respectfully distinguish *Cole, supra*, 233 Cal.App.4th at p. 1456. As the Department points out, this case differs from *Cole* in that here Father's contacts with Daughter directly caused the risk to her emotional well-being. This was not true of the situation in *Cole*.

Father's reply brief in this court did not respond to the Department's analysis of this issue.

3

Father's third argument is the juvenile court's order was particularly egregious given Daughter's aversion to visiting Father and her own unwillingness to enroll in counseling, let alone conjoint counseling with her father. Father maintains the juvenile court abdicated its discretion and in effect allowed Daughter to determine whether any visits will occur. The juvenile court, he claims, impermissibly delegated the court's authority over visits to the child and thus virtually guaranteed visits would never occur. Father cites *In re Julie M.* (1999) 69 Cal.App.4th 41, 51 ("[T]he ultimate supervision and control over this discretion must remain with the court . . . .") (*Julie*) and *Ethan, supra*, 236 Cal.App.4th at p. 662.)

In short, Father objects the order impermissibly gave Daughter veto power. He says Daughter can shut him out simply by refusing to attend joint counseling with him.

Father's argument misconstrues the juvenile court order. It is true, as we have detailed, that the juvenile court initially was

17

attracted to Daughter's counsel's suggestion the court should empower Daughter to decide about visits with Father. This attorney asked for "either no visits or monitored visits *in accordance with the child's wishes*, Your Honor." (Italics added.)

The juvenile court began to create such an order, prompting a mid-sentence interruption by vigilant Department counsel, who interjected that to give veto power to Daughter would be "reversible error. There is case law that the court can't do it." The court immediately grasped the Department's point and agreed: "As I was saying that, I was thinking I can't leave that up to the child."

The court then issued a different custody order. This order is properly interpreted in light of this context. The order does *not* grant Daughter power to veto visits with Father. The court began to give Daughter that power but reversed itself in response to the Department's objection. Instead the court went with the Department's recommendation to bar visits until Father had completed his individual counseling, and then to require Father and Daughter to complete five joint counseling sessions, which the Department accurately described as "equivalent" to a "monitored visitation order."

This order is mandatory. It gives discretion neither to Father nor to Daughter. Father is to complete or make substantial progress in his individual counseling. Father and Daughter are to complete five joint counseling sessions, which are to amount to monitored visits. The order gives Daughter no veto power. Rather, once Father completes his individual counseling, Father has a *right* to five joint counseling sessions with Daughter, to be monitored and supervised by the counselor.

If Daughter refuses to cooperate with this order, Father would be entitled to seek modification of the order in family court. (*In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1548.)

18

This case thus differs from *Julie*, where the juvenile court simply gave children "the option to consent to, or refuse, any future visits" with the parent. (*Julie, supra*, 69 Cal.App.4th at p. 46; see also *id.* at pp. 48–51.) It also differs from *Ethan*. (See *Ethan, supra*, 236 Cal.App.4th at p. 661 [juvenile court dismissed jurisdiction with knowledge its visitation order was not going to be honored because son refused adamantly visitation, so juvenile court "virtually guaranteed that visitation would not occur"].)

Father's reply brief in this court did not respond to the Department's analysis of this issue.

We have authoritatively interpreted the custody order. So interpreted, it is valid.

## DISPOSITION

We affirm.

WILEY, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.